**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN BROWN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| E*TRADE FINANCIAL CORPORATION, RODGER A. LAWSON, KEVIN T. KABAT, MICHAEL A. PIZZI, RICHARD J. CARBONE, ROBERT CHERSI, JAIME W. ELLERTSON, JAMES P. HEALY, JAMES LAM, SHELLEY B. LEIBOWITZ, REBECCA SAEGER, DONNA L. WEAVER and JOSHUA WEINREICH, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:20-cv-03322

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Kevin Brown ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.       This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of E*TRADE Financial Corporation ("E*TRADE" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with E*TRADE, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between E*TRADE and Morgan Stanley.

2.       On February 20, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive 1.0432 shares of Morgan Stanley common stock for each share of E*TRADE stock they own (the "Merger Consideration").

3.      On April 17, 2020, in order to convince E*TRADE shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading S-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that E*TRADE shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by E*TRADE's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Ardea Partners LP ("Ardea") in support of their opinions that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to E*TRADE shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took place in this District and the Company's common stock trades on the NASDAQ Composite, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of E*TRADE common stock.

12.     Defendant E*TRADE is incorporated in Delaware and maintains its principal executive offices at 671 N. Glebe Road, Arlington, Virginia 22203.  The Company's common stock trades on the NASDAQ under the ticker symbol "ETFC."

13.     Individual Defendant Rodger A. Lawson is E*TRADE's Chairman and has been a director of E*TRADE at all relevant times.

14.     Individual Defendant Kevin T. Kabat is E*TRADE's Lead Independent Director and has been a director of E*TRADE at all relevant times.

15.     Individual Defendant Michael A. Pizzi is E*TRADE's Chief Executive Officer and has been a director of E*TRADE at all relevant times.

16.     Individual Defendant Richard J. Carbone has been a director of E*TRADE at all relevant times.

17.     Individual Defendant Robert Chersi has been a director of E*TRADE at all relevant times.

18.     Individual Defendant Jaime W. Ellertson has been a director of E*TRADE at all relevant times.

19.     Individual Defendant James P. Healy has been a director of E*TRADE at all relevant times.

20.     Individual Defendant James Lam has been a director of E*TRADE at all relevant times.

21.     Individual Defendant Shelley B. Leibowitz has been a director of E*TRADE at all relevant times.

22.     Individual Defendant Rebecca Saeger has been a director of E*TRADE at all relevant times.

23.     Individual Defendant Donna L. Weaver has been a director of E*TRADE at all relevant times.

24.     Individual Defendant Joshua Weinreich has been a director of E*TRADE at all relevant times.

25.     The Individual Defendants referred to in paragraphs 13-24 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of E*TRADE (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

27.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 17, 2020, there were approximately 225,000,000 shares of E*TRADE common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of E*TRADE will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly

comparable GAAP equivalent in violation of Section 14(a) of the
Exchange Act;

ii)     whether Defendants have misrepresented or omitted material
information concerning the Proposed Transaction in the S-4 in
violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of
the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer
irreparable harm if compelled to vote their shares regarding the
Proposed Transaction based on the materially incomplete and
misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent
counsel experienced in litigation of this nature, and will fairly and adequately protect the
interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class
and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class
would create a risk of inconsistent or varying adjudications with respect to individual
members of the Class, which would establish incompatible standards of conduct for the
party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with
respect to the matters complained of herein, thereby making appropriate the relief sought
herein with respect to the Class as a whole; and

g.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.  The Proposed Transaction

28.  E*TRADE is a financial services company that provides brokerage and related products and services for traders, investors, stock plan administrators and participants, and registered investment advisors.  The Company offers tools and educational materials as well as professional advice and support to its customers.  These services are provided through E*TRADE's digital platforms and network of industry-licensed customer service representatives and financial consultants, over the phone, by email and online.  E*TRADE also operates federally charted savings banks.

29.  On February 20, 2020, E*TRADE and Morgan Stanley issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> NEW YORK & ARLINGTON, Va.--(BUSINESS WIRE)--Morgan Stanley (NYSE: MS) and E*TRADE Financial Corporation (NASDAQ: ETFC) have entered into a definitive agreement under which Morgan Stanley will acquire E*TRADE, a leading financial services company and pioneer in the online brokerage industry, in an all-stock transaction valued at approximately $13 billion. Under the terms of the agreement, E*TRADE stockholders will receive 1.0432 Morgan Stanley shares for each E*TRADE share, which represents per share consideration of $58.74 based on the closing price of Morgan Stanley common stock on February 19, 2020.

> The combination will significantly increase the scale and breadth of Morgan Stanley's Wealth Management franchise, and positions Morgan Stanley to be an industry leader in Wealth Management across all channels and wealth segments. E*TRADE has over 5.2 million client accounts with over $360 billion of retail client assets, adding to Morgan Stanley's existing 3 million client relationships and $2.7 trillion of client assets. Morgan Stanley's full-service, advisor-driven model coupled with E*TRADE's direct-to-consumer and digital capabilities, will allow the combined business to have best-in-class product and service offerings to support the full spectrum of wealth.

"E*TRADE represents an extraordinary growth opportunity for our Wealth Management business and a leap forward in our Wealth Management strategy. The combination adds an iconic brand in the direct-to-consumer channel to our leading advisor-driven model, while also creating a premier Workplace Wealth provider for corporations and their employees. E*TRADE's products, innovation in technology, and established brand will help position Morgan Stanley as a top player across all three channels: Financial Advisory, Self-Directed, and Workplace," said James Gorman, Chairman and CEO of Morgan Stanley. "In addition, this continues the decade-long transition of our Firm to a more balance sheet light business mix, emphasizing more durable sources of revenue."

"Finally, I am delighted that Mike Pizzi, CEO of E*TRADE, will be joining Morgan Stanley. Mike will continue to run the E*TRADE business within the Morgan Stanley franchise and lead the ongoing integration effort. Mike will report to me and will join the Morgan Stanley Operating and Management Committees. In addition, we will invite one of E*TRADE's independent directors to join our Board. We look forward to welcoming the infusion of management and technology talent that E*TRADE will bring to Morgan Stanley."

"Since we created the digital brokerage category nearly 40 years ago, E*TRADE has consistently disrupted the status quo and delivered cutting-edge tools and services to investors, traders, and stock plan administrators," said Mike Pizzi, Chief Executive Officer of E*TRADE. "By joining Morgan Stanley, we will be able to take our combined offering to the next level and deliver an even more comprehensive suite of wealth management capabilities. Bringing E*TRADE's brand and offerings under the Morgan Stanley umbrella creates a truly exciting wealth management value proposition and enables our collective team to serve a far wider spectrum of clients."

The transaction will create a leading player in Workplace Wealth, combining E*TRADE's leading U.S. stock plan business with Shareworks by Morgan Stanley, a top provider of public stock plan administration and private cap table management solutions. This combination will enable Morgan Stanley to accelerate initiatives aimed at enhancing the workplace offering through online brokerage and digital banking capabilities, providing a significantly enhanced client experience.

E*TRADE has been a pioneer in the digital brokerage and banking space for nearly 40 years and is an iconic brand. E*TRADE's hallmarked, consumer-facing technology platforms will complement Morgan Stanley's leading advisor-facing technology. E*TRADE also provides a full suite of digital banking services, including direct integration with brokerage accounts, checking and high-yield savings accounts, significantly accelerating Morgan Stanley's digital banking efforts. The transaction adds approximately $56 billion of low-cost deposits, which will provide significant funding benefits to Morgan Stanley.

Importantly, the acquisition marks a continuation of Morgan Stanley's decade-long effort to rebalance the Firm's portfolio of businesses so that a greater percentage of Firm revenues and income are derived from balance sheet light and more durable sources of revenues. Upon integration, the combined Wealth and Investment Management businesses will contribute approximately 57% of the Firm's pre-tax profits, excluding potential synergies, compared to only approximately 26% in 2010.

The transaction provides significant upside potential for shareholders of both Morgan Stanley and E*TRADE. Shareholders from both companies will benefit from potential cost savings estimated at approximately $400 million from maximizing efficiencies of technology infrastructure, optimizing shared corporate services and combining the bank entities, as well as potential funding synergies of approximately $150 million from optimizing E*TRADE's approximate $56 billion of deposits. In addition, Morgan Stanley will have enhanced technology and service capabilities to capture a larger portion of the estimated approximate $7.3 trillion of combined current customer assets held away, which will drive significant revenue opportunities.

Morgan Stanley will be better positioned to generate attractive financial returns through increased scale, improved efficiency, higher margins, stronger returns on tangible common equity, and long-term earnings accretion. Morgan Stanley expects the acquisition to be accretive once fully phased-in estimated cost and funding synergies are realized. Morgan Stanley will maintain its strong capital position, with the Firm's common equity tier 1 ratio estimated to increase by over 30bps at closing. The transaction is expected to increase the Firm's return on tangible common equity by more than 100bps with fully phased-in cost and funding synergies and improve Wealth Management's pre-tax profit margin to over 30%.

The acquisition is subject to customary closing conditions, including regulatory approvals and approval by E*TRADE shareholders, and is expected to close in the fourth quarter of 2020.

A conference call to discuss the announced transaction will be held today at 8:30 a.m. ET, hosted by Morgan Stanley Chairman and CEO, James Gorman; Morgan Stanley CFO, Jonathan Pruzan; and E*TRADE CEO, Michael Pizzi. The call and presentation will be available at www.morganstanley.com or by dialing 1-877-895-9527 (domestic) and 1-706-679-2291 (international); the passcode is 5097722. To listen to the playback, please visit our website or dial: 1-855-859-2056 (domestic) or 1-404-537-3406 (international); the passcode is 8469949.

**About E*TRADE**

E*TRADE Financial and its subsidiaries provide financial services including brokerage and banking products and services to traders, investors, stock plan administrators and participants, and registered investment advisers (RIAs).

Securities products and services are offered by E*TRADE Securities LLC (Member FINRA/SIPC). Commodity futures and options on futures products and services are offered by E*TRADE Futures LLC (Member NFA). Managed Account Solutions are offered through E*TRADE Capital Management, LLC, a Registered Investment Adviser. Bank products and services are offered by E*TRADE Bank, and RIA custody solutions are offered by E*TRADE Savings Bank, both of which are federal savings banks (Members FDIC). Employee stock and student loan benefit plan solutions are offered by E*TRADE Financial Corporate Services, Inc. More information is available at https://us.etrade.com/.

**About Morgan Stanley**

Morgan Stanley is a leading global financial services firm providing a wide range of investment banking, securities, wealth management and investment management services. With offices in more than 41 countries, the Firm's employees serve clients worldwide including corporations, governments, institutions and individuals. For further information about Morgan Stanley, please visit www.morganstanley.com.

30.     E*TRADE is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

31.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading S-4

32.     On April 17, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before

it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not

contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or

omits material information that is necessary for the Company's shareholders to make an informed

decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections

14(a) and 20(a) of the Exchange Act.

### The Materiality of Financial Projections

33.    A company's financial forecasts are material information a board relies on to

determine whether to approve a merger transaction and recommend that shareholders vote to

approve the transaction.  Here, the S-4 discloses that "[i]n connection with its strategic review, In

November 2019, E*TRADE management prepared certain non-public and unaudited non-GAAP

standalone financial forecasts . . . which financial forecasts were presented to the E*TRADE board

of directors, and provided to J.P. Morgan and Ardea . . ."  S-4 61.

34.    When soliciting proxies from shareholders, a company must furnish the

information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule

14A sets forth the information a company must disclose when soliciting proxies regarding mergers

and acquisitions.  In regard to financial information, companies are required to disclose "financial

information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-

K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

35.    Under Item 10 of Regulation S-K, companies are encouraged to disclose

"management's projections of future economic performance that have a reasonable basis and are

presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the

usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to

assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

36.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*
>
> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

37.     Here, E*TRADE's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it.  S-4 56-58.

38.     As discussed further below, the non-GAAP financial projections used do not provide E*TRADE's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

39.     The S-4 discloses that "[i]n connection with its strategic review, In November 2019, E*TRADE management prepared certain non-public and unaudited non-GAAP standalone financial forecasts…which financial forecasts were presented to the E*TRADE board of directors, and provided to J.P. Morgan and Ardea . . ."  *Id.* at 61.

40.     The S-4 goes on to disclose, *inter alia*, E*TRADE's forecasted values for projected financial metrics for 2020 through 2030 for (1) Net Income, (2) Total Assets as of December 31, (3) Average Assets for Leverage, and (4) Earnings Per Share, and E*TRADE management Morgan Stanley forecasted values for projected financial metrics for 2020 through 2030 for (1) Net Income, (2) Total Assets, and (3) Supplementary Leverage Exposure, but fails to provide definitions for any of the terms.  This is materially misleading because the S-4 clearly states that "[t]he Unaudited Prospective Financial Information includes certain non-GAAP financial measures."  *Id.* at 63. However, the S-4 fails to identify which of the disclosed projected financial measures are non-GAAP financial measures.

41.     As the S-4 acknowledges that the forecasts contain non-GAAP financial measures, the S-4 fails to disclose: (i) which of the measures are non-GAAP financial measures; (ii) the definition of the non-GAAP financial measures; (iii) the line items used to calculate the non-GAAP metrics; and (iv) a reconciliation of the non-GAAP projections to the most comparable GAAP measures.  *Id.*

42.     The S-4's disclosure of the non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed

and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

43.     The non-GAAP financial projections disclosed on page 61-62 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

44.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

45.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

46.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

47.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as E*TRADE included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully

---

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

48.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from

49.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

50.     In addition to the S-4's violation of Regulation G, the failure to identify the non-GAAP financial measures of provide their definitions is materially misleading as non-GAAP financial measures do not have uniform names or definitions.  The failure to provide any definitions or identify the non-GAAP financials is means that shareholders cannot be sure that terms such as "Net Income" are not actually non-GAAP financials that have been adjusted in some way.

51.     Additionally, the failure to provide reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

52.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above. Indeed, E*TRADE acknowledges that "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as

---

Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

used by E*TRADE and Morgan Stanley may not be comparable to similarly titled amounts used by other companies." S-4 63.

53.    As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

54.    In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 61-62, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

55.    The summary of the valuation methodologies utilized by J.P. Morgan and Ardea, including the utilization of certain of the non-GAAP financial projections described above by J.P. Morgan and Ardea, in connection with its valuation analyses (*id.* at 65, 72-73) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.    With respect to J.P. Morgan's *Dividend Discount Analysis – E*TRADE Standalone*, J.P. Morgan calculated the implied values for E*TRADE common stock by discounting the expected cash dividends, share repurchases and the additional cash distributions E*TRADE would make to achieve a Tier 1 Leverage Ratio of 6.75%, during each year 2020 to 2029. *Id.* at 67. J.P. Morgan applied a perpetuity growth rate range of 2.75% to 3.25% and a 11.0% to 12.0% discount rate, representing E*TRADE's cost of equity, to all categories of distributions. *Id.*

57.    The S-4 fails to disclose the values for the expected cash dividends, share repurchases and additional cash distributions E*TRADE would make to achieve a Tier 1 Leverage Ratio of 6.75% for each year 2020 to 2029.

58.     With respect to J.P. Morgan's *Dividend Discount Analysis – Morgan Stanley Standalone*, J.P. Morgan calculated the implied values for Morgan Stanley common stock by discounting the expected cash dividends, share repurchases, and the additional cash distributions Morgan Stanley would make to achieve a Tier 1 Leverage Ratio of 6%, during each year 2020 to 2029. *Id.* at 69.   J.P. Morgan applied a perpetuity growth rate range of 2.75% to 3.25% and a 10.25% to 11.25% discount rate, representing Morgan Stanley's cost of equity, to all categories of distributions. *Id.*

59.     The S-4 fails to disclose the values for the expected cash dividends, share repurchases, and additional cash distributions Morgan Stanley would make to achieve a Tier 1 Leverage Ratio of 6.75% for each year 2020 to 2029.

60.     With respect to Ardea's *Dividend Discount Analyses for E*TRADE*, Ardea discounted the annual estimated cash dividends, share repurchases and amount of annual additional capital distributions (or minus the additional capital requirements) required to achieve a Tier 1 Leverage Ratio target of 6.75%, over the period December 31, 2029 through December 31, 2029, and a range of terminal values calculated by applying a perpetuity growth rate range of 3.0% to 3.5% to the terminal cash distribution. *Id.* at 75.   Ardea applied a discount rate range of 11.0% to 13.0%, reflecting E*TRADE's cost of equity on a standalone basis. *Id.*

61.     The S-4 fails to disclose the values for the expected cash dividends, share repurchases, and additional cash distributions E*TRADE would make to achieve a Tier 1 Leverage Ratio of 6.75% over the period December 31, 2019 to December 31, 2029.

62.     In order for E*TRADE shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

- 19 -

63.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from E*TRADE shareholders.

64.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

65.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

68.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

69.     The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

70.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

73.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*."  17 C.F.R. § 244.100(b) (emphasis added).

74.     Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

75.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

76.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The

Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

77.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

78.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

79.     E*TRADE is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

80.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

81.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to

the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of E*TRADE within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of E*TRADE, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

84.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The S-4 at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the S-4.

86.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

87.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

88.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Directing Defendants to account to Plaintiff and the Class for all damages sustained

as a result of their wrongdoing and to award damages arising from proceeding with the Proposed

Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 28, 2020

Respectfully submitted,

By: *James M. Wilson, Jr.*
Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Kevin Brown ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against E*Trade Financial Corp. ("E*Trade") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in E*Trade securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 24th day of April, 2020.

_____
Kevin Brown

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 02/19/19 | 200 |
|  |  |  |
|  |  |  |